## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| AMANDA BARE, and CHRISTINA HARTZELL, on behalf of herself and all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| THE ALLSTATE CORPORATION, ALLSTATE INSURANCE COMPANY, ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY, ARITY, LLC, ARITY 875, LLC, and ARITY SERVICES, LLC, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | |

Plaintiffs Amanda Bare and Christina Hartzell (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, and against Defendants The Allstate Corporation, Allstate Insurance Company, Allstate Vehicle and Property Insurance Company, Arity LLC, Arity 875 LLC, Arity Services LLC (collectively, "Defendants"), and alleges the following:

## I.    INTRODUCTION

1.    Unbeknownst to consumers, Defendants, through various subsidiaries and affiliates, have collected "trillions of miles" of consumers' "driving behavior" data from mobile device applications, in-car devices, and vehicles.[1] Defendants then used this voluminous data, all of which they intercepted and collected without consumers' consent, to set automotive insurance rates for their own customers, and sold this ill-gotten data to competing carriers that likewise used it to the detriment of their customers.

---

[1] ARITY, https://arity.com/ (last visited Jan. 16, 2025).

2.      Specifically, Defendants used the illicitly obtained data to build the "world's largest driving behavior database," housing the driving behavior of over 45 million Americans.[2] Defendants created the database for two main purposes: (1) to support Defendants' car insurance business and (2) profit from selling the driving behavior data to third parties, including other car insurance carriers ("Insurers").[3]

3.      Not once did Defendants disclose to consumers, including Plaintiffs, that Defendants routinely intercepted, collected and sold their mobile device data, let alone seek and secure consumers' consent to do so.

4.      Defendants covertly collected much of their "trillions of miles" of data by maintaining active connections with consumers' mobile devices and harvesting the data directly from their phones by developing and equipping in both third-party and proprietary mobile device applications a free software development kit ("SDK") that effectively "bugged" consumers' smartphones.

5.      In general, SDKs provide app developers with tools to build and develop their apps. SDKs usually consist of a set of tools (APIs, software, etc.) with preprogrammed functions that are integrated into an app and operate in the background, and thereby help developers more efficiently program their app.

6.      However, developers may not know the full extent and functions of the code in the SDKs they imbed in their app. Some SDKs, unbeknownst to consumers, siphon consumers' communications and app data, including precise geolocation data, directly to third parties unknown

---

[2] ARITY, "Vehicle Miles Traveled," https://arity.com/solutions/vehicle-miles-traveled/ (last visited Jan. 16, 2025).
[3] ARITY, *supra* note 1.

to app users, and can even track users' locations through public Bluetooth beacons, which enable fine-grained tracking indoors.

7.     Like other SDKs, Defendants' SDK (also referred to herein as the "Arity SDK") is made available to and inserted by other companies as a plug-in to own smartphone applications. Defendants developed and integrated their SDK into third-party apps so that when an individual downloaded the third-party app onto their phone, they also unwittingly downloaded Defendants' software. Once Defendants' software was downloaded onto a consumer's device, the Arity SDK then intercepts and reads massive amounts of consumers' data.

8.     The mountain of valuable data Defendants surreptitiously intercepted and/or collected from consumers' mobile phones includes the phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data, which monitors details such as the phone's altitude, longitude, latitude, bearing, GPS time, speed, and accuracy. Defendants then used this data to build unique profiles of consumers' movements and driving habits by associating the foregoing with mobile device IDs unique to each consumer and additional personally identifying information (PII) (such as names, emails and addresses) procured from other third parties or subject apps themselves.

9.     To encourage developers to adopt Defendants' software, Defendants paid app developers millions of dollars to integrate Defendants' software into their apps. Defendants further incentivized developer participation by creating generous bonus incentives for increasing the size of their dataset. According to Defendants, the apps integrated with their software currently allow them to "capture[] [data] every 15 seconds or less" from "40 [million] *active* mobile connections."[4]

10.     Once collected, Defendants found several ways to monetize the ill-gotten data, including by selling access to Defendants' driving behavior database to other insurers and using

---

[4] ARITY, "Real Time Insights," https://arity.com/solutions/real-time-insights/ (emphasis added) (last visited Jan. 16, 2024).

the data for Defendants' own insurance underwriting. If a consumer requested a car insurance quote or had to renew their coverage, Insurers would access that consumer's driving behavior in Defendants' database. Insurers then used that consumer's data to justify increasing their car insurance premiums, denying them coverage, or dropping them from coverage.

11.     Defendants marketed and sold the data obtained through third-party apps as "driving" data reflecting consumers' driving habits, despite the data being collected from and about the location of a person's phone and regardless of whether that data was generated when a consumer was personally operating a vehicle.

12.     More recently, Defendants have begun purchasing data about vehicles' operation directly from car manufacturers. Defendants ostensibly did this to better account for their inability to distinguish whether a person was actually driving based on the location and movements of their phone. The manufacturers that Defendants purchased data from included Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram. Defendants likewise have used this data for their own insurance underwriting purposes.

13.     Consumers, including Plaintiffs, did not consent to, nor were they aware of Defendants' interception, collection and/or sale of immeasurable amounts of their sensitive data. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented and obtained from consumers.

14.     However, Defendants never informed consumers about their extensive data collection, nor did Defendants obtain consumers' consent to engage in such data collection.

15.     Similarly, Defendants never informed consumers about the myriad of ways that Defendants would analyze, use, and monetize their sensitive data.

16.     As described in more detail throughout this Complaint, Defendants violated numerous state laws and invaded Plaintiffs' and Class members' privacy.

17.     Plaintiffs bring this case on behalf of themselves and all others similarly situated to recover the damages they have sustained and enjoin Defendants' wrongful conduct going forward. Plaintiffs have routinely and regularly used mobile applications that embedded Defendants' tracking software in the form of SDKs.

18.     On information and belief, much of the driving data Defendants shared is improperly and inaccurately associated with her. As a result, Plaintiffs and Class members have suffered an egregious violation of their privacy, in addition to other pecuniary damages, including paying higher insurance premiums than they would have in the absence of Defendants' course of conduct.

## II.    JURISDICTION

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member (including Plaintiffs) is of diverse citizenship from at least one Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

20.     This Court has personal jurisdiction over Defendants because each Defendant has its principal headquarters in Illinois, does business in Illinois, directly or through agents, and has sufficient minimum contacts with Illinois such that it has intentionally availed itself of the laws of the United States and Illinois.

21.     Venue is proper under 28 U.S.C. § 1391(a) through (d) because Defendants' headquarters and principal place of business are located in this District, Defendants reside in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or

emanated from this District, including, without limitation, decisions made by Defendants' governance and management personnel.

### III.   PARTIES

#### A.   Plaintiffs

22.     Amanda Bare is a resident of Santa Clarita, California. Plaintiff's cell phone contains mobile applications that have embedded Defendants' Arity SDK

23.     Christina Hartzell is a resident of Washington, Pennsylvania. Plaintiff's cell phone contains mobile applications that have embedded Defendants' Arity SDK.

#### B.   Defendants

24.     Defendant The Allstate Corporation is an Illinois corporation headquartered in Chicago, Illinois, and incorporated under the laws of Illinois. Together with its subsidiaries, Defendant The Allstate Corporation provides insurance products, including car insurance, throughout the United States, including Illinois.

25.     Defendant Allstate Insurance Company is a wholly owned subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Insurance Company provides insurance products, including car insurance, throughout the United States, including Illinois.

26.     Defendant Allstate Vehicle and Property Insurance Company is a subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Vehicle and Property Insurance Company provides insurance products, including car insurance, throughout the United States, including Illinois.

27.     Defendant Arity, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois,

and it is incorporated under the laws of Illinois. Defendant Arity, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

28.     Defendant Arity 875, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Illinois. Defendant Arity 875, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

29.     Defendant Arity Services, LLC, was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Illinois. Defendant Arity Services, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, including the State of Illinois, and uses predictive analytics to build solutions to sell to third parties.

## IV.     FACTS

30.     Defendants have built highly detailed data profiles of at nearly 50 million Americans, including Plaintiffs.[5] Defendants obtained the data without consumers' knowing by integrating a software into various mobile apps that enabled them to collect data directly from consumers' phones. Defendants have monetized this data in a variety of ways, including by using this ill-gotten data to when underwriting automotive policies, and selling to insurers access to the

---

[5] ARITY, "Vehicle Miles Traveled," https://arity.com/solutions/vehicle-miles-traveled/, (last visited Jan. 16, 2024).

"world's largest driving behavior database," which contains the driving behavior data of nearly 50 million Americans.[6] Defendants never notified consumers nor obtained their consent to intercept, collect or sell sensitive personal information communicated by consumers' mobile phones.

31.     On information and belief, in 2015 Defendants, through their affiliate Arity, designed a software development kit that could be integrated into mobile phone applications to collect data about the location and movements of a person's phone. In general, SDKs can provide app developers a helpful tool to build and develop their apps. SDKs usually consist of a set of tools (APIs, software, etc.) with preprogrammed functions that are integrated into an app and operate in the background. But the SDK Defendants developed was little more than a method for Defendants to scrape user data from several third-party apps under the pretext of providing a necessary function. Specifically, Defendants designed the Arity Driving Engine SDK ("Arity SDK") to collect an immense amount of granular data from or about the location of a person's mobile phone ("Arity SDK Data").

**A.     Defendants Developed Software to Covertly Collect Consumers' Location Data**

34.     Once installed in a mobile app, the Arity SDK harvested several types of data, including but not limited to:

    a.   a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

    b.   "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

---

[6]ARITY, *supra* note 1.

c. "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

d. "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

e. Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, Mobile Advertising ID ("MAID"), device type, app version, and OS version.

35.     The data collected and/or intercepted by the Arity SDK includes myriad device information, as well as Plaintiffs' and Class members' IP addresses, browser and device information, user IDs, geolocation data, and other data, used by Defendants to "fingerprint" individuals for Defendants' benefit, deriving revenue from the use of this data and the later sale thereof to third parties.

36.     Apps that incorporate the SDK collect and transmit sensitive geolocation data to by intercepting data that is generated by a mobile device's operating system. If the user allows location access, whether knowingly or not, to a third-party app incorporating the SDK, the SDK records the device's precise latitude and longitude, along with a timestamp and a unique mobile device identifier, such as an IDFV, IDFA, and/or MAID.

37.     Defendants also track, intercept, receive, and record a user's activities within an app after it has been installed, including the length of time it observed a user's behavior within the app, various events both inside and outside of the app, and the total number of user events recorded with the names of each event on their Apple or Android device.

38.     Critically, this data, including consumers' precise geolocation and driving data, effectively is de-anonymized because the Arity SDK collects alongside consumers' sensitive

information unique device IDs. Initially disaggregated data—such as location and other data that Defendants surreptitiously collect—thus can later be aggregated with additional PII associated with unique device IDs in order to build detailed profiles of unique consumers.

39.    One of the above-referenced unique smartphone identifiers collected by the Arity SDK is a Mobile Advertising ID ("MAID"). A MAID is a unique identifier assigned to a consumer's mobile device to assist marketers in advertising to the consumer. Although a MAID may be changed by a consumer, doing so requires the consumer to proactively reset the MAID on the consumer's mobile device. MAIDs thus can be used to fingerprint consumers across the internet, and associate and aggregate data collected about them in one place with data generated elsewhere. For example, on iPhones, the MAID is referred to as an IDFA, is used for tracking and identifying a user and is assigned at the device level.[7]

40.    Some consumers attempt to block developers from accessing their device's MAID in order to associate a phone's location data and other unique identifiers with a specific individual. However, in addition to the IDFA, app developers also create unique identifiers for users of their apps, referred to as the "Identifier for Vendors," or IDFV.

41.    An IDFV is a code created by an app developer and assigned to all of their apps. This code is also shared between all of the apps created by the developer. The IDFV value is the same for apps from the same developer running on the same device. IDFVs thus provide a way to run cross-promotional iOS campaigns, compatible with iPhones. So long as an IDFV is passed in the tracker URLs and apps, the IDFV can provide app developers with more accurate attribution data for iOS campaigns.

---

[7] The Android equivalent of the IDFA is called GAID

42.     In other words, even when consumers try to protect their privacy by disabling MAID device tracking, App developers can eviscerate those efforts by doing an end-run around those consumer protections and gathered IDFV and other fingerprinting information which allowed it to continue to track consumers without their knowledge or consent, thus further invading their privacy.

43.     By actively intercepting this digital information, including IDFV, without the consent of knowledge of consumers like Plaintiffs, app developers are able to track those consumers by tracking their locations, habits, and personal characteristics, while sharing this rich personal data simultaneously with untold numbers of third-party companies by, in essence, "fingerprinting" each unique device and user, as well as connecting users across devices and devices across users.

44.     Because Defendants' SDK operated and collected data in the background, absent being notified by Defendants or the app, users would be kept in the dark about Defendants' SDK's existence. App users would likewise be unaware that Defendants were directly collecting Defendants' SDK Data from their phones. Defendants never notified nor otherwise informed consumers that they were collecting their data via Defendants' SDK and the apps, yet surreptitiously intercepted and collected Plaintiffs' and Class members' activity while they are using smartphone applications that have installed the Arity SDK without express, constructive, or informed consent.

**B.      Defendants Paid to Integrate the Arity SDK into Mobile Apps**

45.     Since at least 2017, Defendants have been "licensing" their SDK by paying app developers millions of dollars to integrate the Arity SDK into their respective mobile apps. On information and belief, to avoid alerting consumers of their data collection, Defendants only sought

11

to partner with apps that, prior to contracting with Defendants, already contained features that relied on location information to function properly. The apps that integrated Defendants' SDK included Routely,[8] Life360, GasBuddy, and Fuel Rewards.

46.     Each of these apps necessarily requests and receives permission from users to use their location information in order to function as expected, and did so prior to integrating the Arity SDK. But after an app integrated the Arity SDK, if an app user allowed the app to access their location information for those same in-app features, the user also unwittingly enabled Defendants to collect SDK Data without informed and express consent.

47.     Defendants' agreements with app developers generally had similar key provisions. Pursuant to these agreements, Defendants granted an app developer a limited license to integrate their SDK into the developer's mobile app. Once integrated into an app, Defendants were permitted to use their SDK to collect and use the SDK Data from app users' mobile phones.

48.     Pursuant to their agreements with the app developers, Defendants owned any SDK Data they collected from an app user and were permitted to use the SDK Data for their own independent purposes. Defendants further agreed to license or transfer subsets of the SDK Data to the app developers to use to support specific features in their apps, such as displaying a summary of a user's trip and fuel efficiency.

49.     On information and belief, to allow Defendants to better match specific individuals to Defendants' SDK Data using identifiers more specific than the MAIDs or IDFVs discussed above, app publishers also licensed to Defendants other PII collected from their users, including but not limited to first and last name, phone number, address, and zip code. Defendants could then

---

[8] Defendants now own the Routely app. *See* ARITY, "Routely," https://arity.com/solutions/real-time-insights/ (last visited Jan. 16, 2024).

combine this PII with the SDK data in order to even more precisely identify the specific person whose information was intercepted and/or collected.

## C. Defendants Monetized SDK Data to the Detriment of Consumers

30. Defendants used the SDK Data and other PII to develop, advertise, and sell several different products and services to third parties, including insurers, as well as for Defendants' own underwriting purposes. Defendants' products and services included:

(a) Drivesight. In 2015, Defendants developed Drivesight to generate a driving score based on Defendants' own scoring model by analyzing data and generating driving scores that assign a particular value to an individual's driving risk.

(b) ArityIQ. Defendants let companies, including Insurers, "[a]ccess actual driving behavior collected from mobile phones and connected vehicles to use at time of quote to more precisely price nearly any driver."[9]

(c) Arity Audiences. Defendants let companies, including Insurers, "[t]arget drivers based on risk, mileage, commuting habits" and "[m]ore effectively reach [their] ideal audiences with the best offers to eliminate wasted spend, increase retention, and achieve optimal customer LTV."[10] As part of this product, Defendants displayed ads to the users of apps that agreed to integrate Defendants' SDK.

(d) Real Time Insights. Defendants advertised that their business customers could "[r]eceive granular driver probe and event data for real-time applications."[11]

(e) Routely. Defendants offer consumers Routely, a "free" application which purports to provide "helpful insights" into the consumers' driver data. By contrast, when

---

[9] ARITY, "Arity IQ," https://arity.com/solutions/arity-iq/ (last visited Jan. 16, 2025).
[10] ARITY, "Arity Audiences," arity.com/solutions/arity-audiences/ (last visited Jan. 16, 2025).
[11] ARITY, "Real Time Insights," https://arity.com/solutions/real-time-insights/ (last visited Jan. 16, 2025).

marketing to Insurers, Defendants describe Routely as "telematics in a box" that Insurers can use to "more accurately identify drivers with riskier driving profiles based on actual driving data, provide personalized discounts or surcharges at renewal, promote safer driving habits, and improve retention of [their] safer drivers."[12]

31.     Notably, Defendants primarily marketed the SDK Data to third parties as "driving behavior" data as opposed to what it really is: data about the movements of a person's mobile phone. On information and belief, Defendants had no way to reliably determine whether a person was driving at the time Defendants collected the SDK Data, though that did not prevent Defendants and their customer from using it as such.

32.     For example, if a person was a passenger in a bus, a taxi, or in a friend's car, and that vehicle's driver sped, hard braked, or made a sharp turn, Defendants would conclude that the passenger, not the actual driver, engaged in "bad" driving behavior based on Defendants' SDK Data.[13] Defendants would then subsequently sell and share the data so it could be used to inform decisions about that passenger's insurability based on their "bad" driving behavior. Defendants' public advertising for their products and services do not disclose the limitations of Defendants' SDK Data.

33.     To potentially account for Defendants' SDK Data's limitations, Defendants sought to combine the SDK Data with data collected directly from vehicles. As a result, Defendants began

---

[12]ARITY, "Routely," https://arity.com/solutions/routely/ (last visited Jan. 16, 2025).

[13] As a further example, it was publicly reported that a person's driving score was lowered because the "driving" behavior data collected from his phone claimed he was driving when he was actually riding a roller coaster. *See* Chad Murray, "Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast," CINCINNATI ENQUIRER, https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cuts-driving-score-man-riding-the-beast- kings-island/75554987007/.

purchasing consumers' driving-related data from car manufacturers, such as Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram. On information and belief, consumers did not consent, nor were otherwise aware that, Defendants purchased their driving-related data from these car manufacturers.

34.     Despite collecting vast amounts of consumer location and other data for consumer advertising and targeting purposes, Defendants do not disclose its practice of collecting and sharing vast amounts of location and device use data when seeking a user's consent to data location collection. Defendants fail to obtain informed consent in apps. And, as elaborated upon below, Defendants also do not verify whether the third-party apps that incorporate the SDK obtain informed consumer consent prior to collecting, recording, using and disseminating consumers' location data.

**D.     Defendants' Lack of Privacy Disclosures**

35.     Consumers who download and use third-party applications that incorporate the SDK are even worse off because they are likely unaware that Defendants collect and sell geolocation data linked to their mobile device to the highest bidder.

36.     As a result, users of third-party apps that incorporate the SDK were never informed that Defendants collected and used their private location data, nor have they provided informed consent. Consumer are not informed that their location will be collected multiple times per day and that their movements will be shared with third parties, who will then purchase additional data about them in order to create and exploit detailed consumer profiles.

37.     Apps that use the SDK and are installed on consumers' mobile phones and record, intercept, and transmit geo-location data concerning their whereabouts to Defendants, as well as other data and information concerning consumers and their mobile phones—obtained both through

the SDK and other sources—without consumers' express consent or knowledge, in order to create detailed profiles of users that are made available to unknown third parties for a profit, all at consumers' expense.

38.     Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented to consumers. However, neither Defendants, nor the apps on Defendants' behalf, informed consumers that Defendants were collecting the SDK Data. Nor did Defendants, nor the apps on Defendants' behalf, inform consumers of the various ways that Defendants would collect, use, and ultimately monetize the SDK Data.

39.     For example, Life360 merely told app users that it needed location sharing turned on "to enable data use for the in-app map, Place Alerts, and location sharing with [a user's] Circle." Nowhere did Life360 even mention Defendants' existence, let alone any of Defendants' data collection or sales.

40.     Because Defendants did not disclose their conduct, consumers were wholly unaware that Defendants were collecting SDK Data from their phone. Consumers were likewise wholly unaware that Defendants would use the SDK Data to create and sell several different products and services to third parties, including Insurers.

41.     Defendants did not provide consumers with any sort of notice of their data and privacy practices, nor did the mobile apps notify consumers about Defendants' practices on Defendants' behalf. *See* Figure 1. Similarly, neither Defendants nor the mobile apps notified consumers of the ways in which their SDK Data would be used, nor did consumers agree to have their data used for Defendants' own products or services. *See id*.



42.     Even if a consumer took the extra step to investigate Defendants outside of their app, navigated to Defendants' website, and located their privacy disclosures, they would still not understand what Defendants did with their data. Consumers reading Defendants' privacy disclosures are met with a series of untrue and contradictory statements that do not reflect Defendants' practices.

43.     For example, Defendants state that they "do not sell personal information for monetary value," which is untrue. Defendants sold a number of data-based products and services

for monetary value that linked a specific app user to their alleged driving behavior. Further, Defendants do not provide consumers with the ability to request that Defendants stop selling their data.

44.     Defendants likewise obscured how they used consumers' data. In Defendants' privacy disclosures, Defendants state that they "[u]se [consumers'] personal data for analytics and profiling." But in describing how Defendants "profile" consumers, the description does not reflect their actual "profiling" conduct—which consisted of Defendants combining the SDK Data and other PII to create a database of driving profiles for more than 45 million Americans and selling access to said database. Rather Defendants describe their profiling activities as follows:

> We use your personal data to assist in our development of predictive driving models. We may profile [consumers'] personal data only for the purposes of creating a driving score ('Driving Score'), which is used for our analytics purposes to develop and validate our predictive driving models.

51.     In the event a consumer took the extraordinary steps of tracking down Defendants' privacy statement, finding the subparagraph describing profiling, parsing through Defendants' convoluted description of their profiling activities, and concluding that they did not want Defendants to use their data to create a "Driving Score" about them, consumers still could do nothing to stop Defendants from collecting their data and creating a Driving Score. Defendants did not describe, nor provide, a method for a consumer to request that their data not be used to profile them.

**E.     Defendants' Practices Cause Substantial Injury to Consumers**

52.     As described herein, Defendants and their customers use the SDK Data to underwrite automotive insurance policies, often increasing consumers' rates based on SDK Data collected without consumers' consent and that often times does not reflect consumers' actual

driving behaviors or habits. But it is not only Class members' pecuniary interests that may have been harmed; Defendants' conduct also injured their privacy rights.

53.     As described above, the data collected, retained, purchased, and sold by Defendants may be used to identify individual consumers. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

54.     Making matters worse for consumers, the location data sold by Defendants typically includes multiple timestamped signals for each MAID and IDFV. By plotting each of these signals of a map, much can be inferred about the mobile device owners. For example, the location of the mobile device at night likely corresponds to the user's home address. This, coupled with other PII, can easily identify the name of the owner or resident of a particular address.

55.     By designing the Arity SDK to regularly transmit users' location data, Defendants thus collect highly sensitive information from consumers, including where they live, work, worship, send themselves or their children to school or obtain child care, receive medical treatment, go to rallies, demonstrations, or protests, and any other information that can be gleaned from tracking a person's day-to-day movements.

56.     Defendants' practice of obtaining and using additional data and information concerning consumers, alone and in combination with the geo-location data, all without users' consent, therefore is likely to result in consumer injury. The harm suffered by consumers is compounded by the fact that, on information and belief, Defendants retain the consumer location data for years—far longer than reasonably necessary—thereby exposing consumers to significant harm.

57.     Once the information has been collected and stored, the information can be sold multiple times to companies those consumers have never heard of and never interacted with. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

58.     Allowing a person access to such information, even for a limited duration, can cause substantial injury to the user.

59.     Defendants' collection and use of location data is completely unknown and/or opaque to consumers: consumers are not informed as to who has collected their location, how it is being used, who that data is being shared with, and how long the data will be retained—let alone provided sufficient information to consent to the interception and use of their data.

**F.     Plaintiffs' Injuries**

60.     As described above, the data collected, retained, purchased, and sold by Defendants may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

### *Plaintiff Bare*

61.     Plaintiff Bare is a resident and citizen of the state of California who resides in Santa Clarita, California.

62.     Plaintiff's cell phone contains mobile applications that have embedded Defendants' SDK.

63.     Plaintiff has used a mobile application, with SDK embedded within it, since 2024 in order to track the location of her teenage son. Plaintiff shares that mobile application's account with her mother.

64.     On information and belief, Defendants' SDK harvested several types of data from Plaintiff's phone without her knowledge or consent, including but not limited to her:

   a.  a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

   b.  "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

   c.  "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

   d.  "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

   e.  Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

65.     Plaintiff was unaware that Defendants' SDK was installed on her phone, much less that it was silently and surreptitiously collecting her granular location data and other types of data, including her driving data.

66.     Plaintiff did not consent to Defendants' conduct, nor does she have any relationship with the Defendants.

67.     Plaintiff's car insurance policy was issued by Farmer's Insurance Group and her insurance premiums have more than doubled over a two year period. Plaintiff has noticed a significant increase over the last two years, as opposed to a steady increase that would be expected from year to year. Importantly Plaintiff has not had any speeding tickets, or been at fault in a major accident that insurance company that could be attributed to these staunch and unexpected increases.

68.     The PII and other personal data collected by Defendants regarding Plaintiff and her family, including her geolocation and accelerometer data, could be shared with third parties and

subject her to increased insurance policy prices, in addition to companies drawing other negative conclusions from the decontextualized data.

69.     Plaintiff's driving data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her driving data, which is in the possession of third parties who have used and will use it for their own financial advantage.

70.     Plaintiff had a reasonable expectation of privacy in her vehicle, including details data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her driving data invaded Plaintiff's privacy rights.

71.     Plaintiff had a reasonable expectation of privacy over the relationships she keeps, including that the geolocation and identities of those individuals who seek to privately and discreetly share their location with her, would not be collected or shared without her express consent or authorization. Defendants' actions raise numerous concerns about invading Plaintiff's privacy rights and rights to associate.

### *Plaintiff Hartzell*

72.     Plaintiff Hartzell is a resident and citizen of the state of Pennsylvania who resides in Washington, Pennsylvania.

73.     Plaintiff's cell phone contains mobile applications that have embedded Defendants' SDK.

74.     On information and belief, Defendants' SDK harvested several types of data from Plaintiff's phone without her knowledge or consent, including but not limited to her:

        a.     a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b. "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

c. "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

d. "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

e. Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

75. Plaintiff was unaware that Defendants' SDK was installed on her phone, much less that it was silently and surreptitiously collecting her granular location data and other types of data, including her driving data.

76. Plaintiff did not consent to Defendants' conduct, nor does she have any relationship with the Defendants.

77. Plaintiff has not had any accidents, speeding tickets, or other moving violations that could be attributed to these staunch and unexpected increases. Yet, the PII and other data collected by Defendants regarding Plaintiff, including her geolocation and accelerometer data, could be shared with third parties and subject her to increased insurance policy prices, in addition to companies drawing other negative conclusions from the decontextualized data.

78. Plaintiff's driving data has tangible value. Because of Defendants' conduct, Plaintiff has lost control over the use of her driving data, which is in the possession of third parties who have used and will use it for their own financial advantage.

79. Plaintiff had a reasonable expectation of privacy in her vehicle, including details data about her location, routes, schedule, and driving behaviors would not be collected or shared without her express consent or authorization. Defendants' actions of secretly intercepting, using, and disclosing her driving data invaded Plaintiff's privacy rights.

80.     Plaintiff has used a mobile application with SDK embedded within it since 2024 in order to track her adult friend, who recently began a new relationship, as a safety measure among friends. Plaintiff had a reasonable expectation of privacy over the relationships she keeps, including that the geolocation and identities of those individuals who seek to privately and discreetly share their location with her, would not be collected or shared without her express consent or authorization. Defendants' actions raise numerous concerns about invading Plaintiff's privacy rights and rights to associate.

## V.     CLASS ALLEGATIONS

81.     Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose data, including but not limited to their geolocation data, was sold by Defendants without their consent (the "Class").

32.     Plaintiff Bare also brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass Pennsylvania residents, defined as:

> All persons in California whose data, including but not limited to their geolocation data, was sold by Defendants without their consent (the "California Subclass").

33.     Plaintiff Hartzell also brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass Pennsylvania residents, defined as:

> All persons in Pennsylvania whose data, including but not limited to their geolocation data, was sold by Defendants without their consent (the "Pennsylvania Subclass").

34.     Excluded from the Class and Subclass are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are any judge judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

35. Plaintiffs reserve the right to expand, limit, modify, or amend the class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based on, *inter alia*, changing circumstances and/or new facts obtained.

36. **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

37. **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the Class.

38. **Adequate representation:** Plaintiffs will represent and protect the interests of the Class both fairly and adequately. Plaintiffs have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the Class, and their interests do not conflict with the interests of the Class members they seek to represent.

39. **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the

proposed Class are inherent in Defendants' wrongful conduct because the injuries incurred by Plaintiffs and each member of the Class arose from the same conduct alleged herein.

40.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

    a.  Whether Defendants collected Plaintiffs' and Class Members' Driving data;

    b.  Whether Plaintiffs and Class Members consented to such collection;

    c.  Whether Plaintiffs and Class Members consented to have their Driving Data shared with third parties;

    d.  Whether Defendants were unjustly enriched to the detriment of Plaintiffs;

    e.  Whether Defendants obtained Plaintiffs' and Class Members' data without consent;

    f.  Whether Defendants, through the actions alleged in this complaint, violated consumer protection laws in the state of Pennsylvania;

    g.  Whether Defendants' conduct constitutes violations of the Federal Wiretap Act;

    h.  Whether Defendants' conduct constitutes violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act.

    i.  Whether Defendants' conduct constitutes violations of the Stored Communications Act;

    j.  Whether Defendants' conduct constitutes an invasion of privacy;

    k.  Whether Defendants' conduct was knowing and willful;

    l.  Whether consumers and Class members have been damaged by Defendants' conduct and the amount of such damages; and

    m.  The nature and scope of appropriate injunctive relief.

41. **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

42. Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

c. Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

d. The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. §§ 2510, *et seq.*
### (ON BEHALF OF PLAINTIFFS AND CLASS)

43.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

44.     The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

45.     In relevant part, the FWA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

46.     The FWA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the FWA. 18 U.S.C. § 2511(1)(c) & (d).

47.     The FWA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

48.     The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

49.     The FWA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

50. The FWA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

51. The FWA defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

52. The FWA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

53. Defendants, corporations, are each a person as defined by 18 U.S.C. § 2510(6).

54. As alleged herein, the Defendants have intercepted, in real time and as they were transmitted, the contents of electronic communications, including but not limited to geolocation data, accelerometer data, magnetometer data, and gyroscopic data.

55. The data and transmissions within, to, and from Plaintiffs' and Class Members' phones constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photo optical systems that affect interstate commerce.

56. Defendants intercepted these transmissions by collecting them via Defendants' SDK to their own servers, unbeknownst to Plaintiffs and Class Members.

57. As detailed herein, the electronic communications detailed above that Defendants have intercepted are tied to individuals and not anonymized.

58. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiffs and Class members were not aware and could not have reasonably

expected that unknown third party would install software on their mobile devices that would track and transmit their physical location and communications, and share Plaintiffs' and Class members' personal information with other parties.

59.     In further violation of the FWA, Defendants have intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. §2511(1)(a). 18 U.S.C. §2511(1)(d).

60.     Specifically, Defendants have used the contents of the communications described above to increase driving insurance premiums for members of the Class for their own financial and commercial benefit, obtaining substantial profit.

61.     As a result, Plaintiffs and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and Personal Information.

62.     Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

63.     Plaintiffs and Class Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial, including an award of reasonable attorneys' fees and costs and punitive or exemplary damages for Defendants' willful violations.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE STORED COMMUNICATIONS ACT
## 18 U.S.C. §§ 2701, *et seq.*
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

64.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

65.     The Federal Stored Communications Act ("SCA"), enacted in 1986 as part of the Electronic Communications Privacy Act ("ECPA"), creates a civil remedy for those whose stored electronic communications have been obtained by one who "intentionally accesses without authorization" or "intentionally exceeds an authorization to access" a facility through which an electronic communication service ("ECS") is provided. 18 U.S.C. §§ 2701, 2707.

66.     The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of communications in electronic storage.

67.     "Electronic communication" is defined as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

68.     "Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15) (incorporated by reference in 18 U.S.C. § 2711(1)).

69.     "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication . . . ." 18 U.S.C. §§ 2510(17) (incorporated by reference in 18 U.S.C. § 2711(1)).

70.    Plaintiffs and Class members, as individuals, and Defendants, as corporations or legal entities, are "persons" within the meaning of 18 U.S.C. § 2510(6), and for purposes of 18 U.S.C. § 2707.

71.    The data and transmissions within, to, and from Plaintiffs' and Class Members' phones constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photo optical systems that affect interstate commerce.

72.    Plaintiffs' and Class Members' communications were intercepted by Defendants' SDK, and stored on their own servers, unbeknownst to Plaintiffs and Class Members.

73.    As detailed herein, the electronic communications detailed above that Defendants have intercepted are tied to individuals and not anonymized.

74.    As alleged herein, there is a reasonable expectation of privacy within a person's Electronic communications, and Plaintiffs and Class Members reasonably expected privacy while using their phones based on common understanding.

75.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiffs and Class members were not aware and could not have reasonably expected that unknown third party would install software on their mobile devices that would track and transmit their physical location and communications, and share Plaintiffs' and Class members' personal information with other parties.

76.    Plaintiffs and Class Members did not authorize Defendants to access their phones or the communications stored within them.

77.    Defendants intentionally accessed these communications without authorization.

78. Defendants intentionally exceeded their authority to access these communications without authorization.

79. In accessing Plaintiffs' and Class Member's phones and Personal Data without authorization and, in doing so, obtaining access to the electronic communications stored there, Defendants violated the SCA, 18 U.S.C. § 2701.

80. Defendants conduct was willful and intentional, and invaded Plaintiffs' and Class Members' expectations of privacy within their phone and privacy of the personal interactions and communications.

81. Defendants have profited from their violation of the SCA, by, among other things, using the improperly accessed communications, location data and personal data to sell to third parties, and increase the price of car insurance.

82. The communications unlawfully accessed by Defendants have significant value, evidenced by the expenditures made by Defendants in order to deploy SDK's across applications and to collect information directly from vehicles.

83. Because of Defendants conduct, Plaintiffs and Class Members have forever lost the value of their data, their privacy interest in the data, and their control over its use.

84. Because Plaintiffs and Class Members have been aggrieved by Defendants intentional acts in violation of the SCA, Plaintiffs and the Class are entitled to bring this civil action to recover relief and damages. 18 U.S.C. § 2707.

85. As a result of Defendants' conduct, Plaintiffs and Class Members are entitled to all damages set forth in 18 U.S.C. § 2707 including declaratory and equitable relief, compensatory damages measured by actual damages and Defendants' profits, reasonable attorneys' fees and costs, all available statutory relief, and punitive damages as determined by the Court.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. § 1030, *et seq.*
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

86.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

87.     The Computer Fraud and Abuse Act ("CFAA"), enacted in 1986 as part of the ECPA, prohibits the intentional accessing, without authorization or in excess of authorization, of a computer under certain circumstances. 18 U.S.C. § 1030(a).

88.     The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of information within their computers.

89.     The CFAA specifically provides that it is unlawful to "intentionally access a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

90.     The CFAA also specifically provides that it is unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization or exceed[ing] authorized access" and thereby "further[] the intended fraud and obtain[] anything of value . . . ." 18 U.S.C. § 1030(a)(4).

91.     Plaintiffs and Defendants, as corporations or legal entities, are "persons" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(12).

92.     A "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(10).

93.     "Exceeds authorized access" is defined as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain." 18 U.S.C. § 1030(e)(6).

94.     A "protected computer" is defined as "a computer . . . which is used in or affecting interstate or foreign commerce or communication . . . , [or that] has moved in or otherwise affects interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

95.     Plaintiffs' and Class Members' phones constitute a "computer" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(1).

96.     The phones of Plaintiffs' and Class Members' are used in and affect interstate and foreign commerce and constitute "protected computers" within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

97.     Defendants intentionally accessed the protected computers in Plaintiffs' and Class Members' possession by through the usage of SDKs without Plaintiffs' or Class Members' authorization, or in a manner that exceeded Plaintiffs' and Class Members' authorization, and obtained information therefrom in violation of the CFAA. 18 U.S.C. § 1030(a)(2)(C).

98.     As alleged herein, Defendants conduct constituted a knowing intent to defraud Plaintiffs and Class Members of their valuable PII and other personal data and profit thereby. 18 U.S.C. §1030(a)(4).

99.     Defendants' use of MAIDs, IDFAs, IDFVs and its SDK constitutes the manner by which Defendants accessed Plaintiffs' and Class Members' communications while they are using their smartphones

100.    The value of the information Defendants obtained from the protected computers in Plaintiffs' and Class Members' possession exceeded $5,000 in a one-year period, as evidenced by Defendants' significant profits from the disclosures of this information. 18 U.S.C. § 1030(a)(4).

101.    Plaintiffs and Class Members have suffered harm and injury due to Defendants' unauthorized access to the communications containing their private and personal information.

102.    A civil action for violation of the CFAA is proper if the conduct involves "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." Because the loss to Plaintiffs and Class Members during any one-year period within the relevant timeframe, including the loss of their privacy interest in and control over their PII and other personal data, exceeded $5,000 in the aggregate, Plaintiffs and the Class are entitled to bring this civil action and are entitled to economic damages, compensatory damages, injunctive, equitable, and all available statutory relief, as well as their reasonable attorney's fees and costs and other relief as permitted by the CFAA. 18 U.S.C. § 1030(g).

### FOURTH CAUSE OF ACTION
### INVASION OF PRIVACY
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

103.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

104.    The right of privacy has been defined as the right to be let alone. Restatement (Second) of Torts, § 652A, comment (a). This includes personal liberty and the right "to be let alone."

105.    Plaintiffs and Class members a right to protection against the intentional intrusion into their personal matters, including their PII, driver behavior information, and location.

106.    Plaintiffs and Class members hold, and at all relevant times held, a legally protected privacy interest in their PII and other personal data and are entitled to the protection of private property, matters, and information therein from intentional intrusions and unauthorized access.

107.    As Plaintiffs and Class Members used and carried their phones, visiting family and going about their days, they have unknowingly created troves of highly sensitive data mapping their respective personal lives which is then collected, captured, transmitted, accessed, compiled, stored, analyzed, and sold—all without their knowledge or informed consent.

108.    The Private Information of Plaintiffs and Class Members consists of PII and other personal data that were never intended to be shared beyond to third parties.

109.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and other personal data, and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

110.    Defendants intentionally invaded Plaintiffs' and Class members' privacy interests by deliberately designing devices and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their PII and other data.

111.    Defendants' unauthorized acquisition and collection of Plaintiffs' and Class Members' PII and other personal data, is highly offensive to a reasonable person. The continued nonconsensual surveillance of an individual in their private capacity, as Defendants have done and continue to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound and egregious infringement upon the most personal and sacred aspects of one's life. Plaintiffs have unknowingly been subjected to constant observation while they go about their days, which destabilizes the very essence of personal liberty.

112.    Defendants' conduct exploited Plaintiffs' phones in order to record and transmit Plaintiffs' highly sensitive and personally identifiable data and behavior.

113.    Defendants' willful and intentional use of Plaintiffs' and Class Members' PII and other personal data constitutes an intentional interference with Plaintiffs' and the Class Members'

interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

114.    Because Defendants intentionally and willfully acquired Plaintiffs' data, Defendants had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

115.    Defendants' conduct constitutes and, at all relevant times, constituted serious and highly offensive invasions of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would record, collect, capture, sell, take and make use of—and allow third-party companies to take and make use of Plaintiffs' and Class Members' PII and other personal data.

116.    Defendants profited from Plaintiffs' and Class members' data without compensating them, and often inaccurately reporting on Plaintiffs' and Class members' driving abilities and history to third parties. Plaintiffs and Class members did not receive any compensation in return for the improper use of their personal data. Defendants deprived Plaintiffs and Class members of the right to control how their personal information is collected, used, or disseminated and by whom.

117.    Plaintiffs, on behalf of themselves and Class members, seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, loss of time, money, and opportunity costs, plus prejudgment interest, and costs.

118.    Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendants.

119.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their PII and other personal data. A judgment for

monetary damages will not undo Defendants' disclosure of the information to Defendants, who on information and belief, continue to possess and utilize that information.

120.    Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of Plaintiffs' and Class members' PII and other data and to adhere to its common law, contractual, statutory, and regulatory duties.

## FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

121.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

122.    To the extent required by law, Plaintiffs bring this claim in the alternative to any legal claims that may be alleged.

123.    Plaintiffs and Class Members have an interest in precluding the dissemination and misuse of their geolocation, and other PII and other personal data by Defendants, and precluding the use of their personal property without observation, intrusion, or interference by Defendants.

124.    Plaintiffs and Class Members had no knowledge and did not consent or authorize Defendants to obtain their driving telematics data or to share it with third parties, let alone the specific data brokers Defendants shared it with and/or sold it to.

125.    Plaintiffs and Class members unwittingly conferred a benefit upon Defendants.

126.    Defendants acquired valuable personal location information belonging to Plaintiffs and Class members which it then sold to other parties without the consent or authorization of Plaintiffs and Class members.

127.    Plaintiffs and Class members received nothing from this transaction. Plaintiffs lack an adequate remedy at law, and pleads this cause of action in the alternative to the extent Plaintiffs are required to do so.

128.    Defendants benefit from the use of Plaintiffs' and Class Members' PII and other personal data and unjustly retained those benefits at their expense.

129.    Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data for reports for auto insurance companies to influence Plaintiffs' and Class Members' insurance rates without their prior knowledge or consent.

130.    Defendants have been unjustly enriched in retaining the revenues derived from the sale of Plaintiffs' and Class members' data, including their geolocation data. Retention of those moneys under these circumstances is unjust and inequitable because Defendants did not obtain the meaningful consent of Plaintiffs and Class members before selling their data to third parties as described above.

131.    Defendants exceeded any authorization given and instead consciously disclosed and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

132.    Defendants have knowledge of such benefits.

133.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

134.    Plaintiffs and members of the putative class seek non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT
### *Cal. Penal Code. § 502*
## (ON BEHALF OF PLAINTIFF BARE AND THE CALIFORNIA SUBCLASS)

135.    Plaintiff Bare ("Plaintiff" for this Count) incorporates the above allegations by reference as if fully set forth herein.

136.    The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

137.    Plaintiff's and Class Members' smartphones constitute "computers" within the scope of the CDAFA.

138.    Defendants violated the following sections of the CDAFA:

a.   Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

b.   Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

c. Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

139. Defendants knowingly accessed Plaintiff's and Class Members' smartphones without their permission by including within the SDK that Defendants provides to app developers software that intercepts and transmits data, communications, and personal information concerning Plaintiff and Class Members.

140. Defendants used data, communications, and personal information that they intercepted and took from Plaintiff's and Class Members' smart phones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class Members.

141. Defendants took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class Members' smartphones.

142. Defendants knowingly and without Plaintiff's and Class Members' permission accessed or caused to be their smartphones by installing without Plaintiff's and Class Members' informed consent software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class Members.

143. Plaintiff and Class Members are residents of California, and used their smartphones in California. Defendants accessed or caused to be accessed Plaintiff's and Class Members' data, communications, and personal information from California. On information and belief, Defendants uses servers located in California that allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class Members.

144. Defendants were unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class Members' data, communications, and personal information without their

permission, and using it for Defendants' own financial benefit. Defendants have been unjustly enriched in an amount to be determined at trial.

145.    As a direct and proximate result of Defendants' violations of the CDAFA, Plaintiff and Class Members suffered damages.

146.    Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

147.    Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class Members seek an award of reasonable attorneys' fees and costs.

148.    Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class Members seek punitive or exemplary damages for Defendants' willful violations of the CDAFA.

**SEVENTH CAUSE OF ACTION**
**USE OF A PEN REGISTER OR TRAP AND TRACE DEVICE**
**Cal. Penal Code § 638.51**
**(ON BEHALF OF PLAINTIFF BARE AND THE CALIFORNIA SUBCLASS)**

149.    Plaintiff Bare ("Plaintiff" for this Count) incorporates the above allegations by reference as if fully set forth herein.

150.    California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

151.    California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

152.    Defendants' SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class Members' location data and personal information—from the electronic communications transmitted by their smartphones.

153.    Defendants were not authorized by any court order to use a pen register to track Plaintiff's and Class Members' location data and personal information.

154.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

<u>**EIGHTH CAUSE OF ACTION**</u>
**VIOLATION OF THE CALIFORNIA WIRETAPPING ACT**
**Cal. Penal Code § 631**
**(ON BEHALF OF PLAINTIFF BARE AND THE CALIFORNIA SUBCLASS)**

155.    Plaintiff Bare ("Plaintiff" for this Count) incorporates the above allegations by reference as if fully set forth herein.

156.    At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

157.    The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, including the Wiretapping Act, "to protect the right of privacy" of residents of California. Cal. Penal Code § 630.

158.    The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

159.    The California Wiretapping Act prohibits:

any person [from using] any machine, instrument, [] contrivance, or in any other manner . . . [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and

without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

160.    Plaintiff's and Class Members' specific user input events and choices on their mobile devices that are tracked by Defendants' SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the Wiretapping Act.

161.    Plaintiff and Class Members are residents of California, and used their smartphones within California. As such, Defendants intercept, read, or attempt to reads Plaintiff's and Class Members' data, communications, and personal information in California.

162.    On information and belief, Defendants use servers in California to intercept, track, process, or otherwise use Plaintiff's and Class Members' data, communications, and personal information within California.

163.    Defendants intercept Plaintiff's and Class Members' communications while they are in transit to and from Plaintiff's and Class Members' smartphones and the apps, app developers, and cellphone towers; Defendants transmit a copy of Plaintiff's and Class Members' communications to themselves. Defendants use the contents of the communications to sell to third parties and in other methods for its own pecuniary gain.

164.    Neither Defendants nor any other person informed Plaintiff and Class Members that Defendants were intercepting and transmitting Plaintiff's private communications. Plaintiff and Class Members did not know Defendants were intercepting and recording their

communications, as such they could not and did not consent for their communications to be intercepted by Defendants and thereafter transmitted to others.

165.    Defendants' SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Plaintiff's and Class Members' communications while they are using their smartphones.

166.    Defendants use and attempt to use or communicate the meaning of Plaintiff's and Class Members' communications by ascertaining their personal information, including their geolocation and places that they have visited, in order to sell Plaintiff's and Class Members' personal information to third parties.

167.    At all relevant times to this complaint, Defendants intercepted and recorded components of Plaintiff's and the putative class' private telephone communications and transmissions when Plaintiff and other Class Members accessed Defendants' software via their cellular mobile access devices within the State of California.

168.    At all relevant times to this complaint, Plaintiff and the other Class Members did not know Defendants were engaging in such interception and recording and therefore could not provide consent to have any part of their private videoconferencing communications intercepted and recorded by Defendants and thereafter transmitted to others.

169.    At the inception of Defendants' illegally intercepting and storing the geolocation and other personal data, Defendants never advised Plaintiff or the other Class Members that any part of this sensitive personal data would be intercepted, recorded and transmitted to third parties.

170.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to

effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

171.    Defendants' use of MAIDs, IDFAs, IDFVs and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

172.    At all relevant times, by using Defendants' MAID software and SDK as well as tracking Plaintiff's and Class Members' geolocation, Defendants intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and class Members on the one hand, and the specific sites and locations Plaintiff and Class Members visited on the other.

173.    At all relevant times, by using Defendants' geolocation tracking software technology, Defendants willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative class Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

174.    Plaintiff and Class Members did not consent to any of Defendants' actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or Class Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff and Class Members' electronic communications.

175.   Plaintiff's and the Class Members devices of which Defendants accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

176.   Defendants violated Cal. Penal Code § 631 by knowingly accessing and without permission accessing Plaintiff's and Class Members' devices in order to obtain their personal information, including their device and location data and personal communications with others, and in order for Defendants to share that data with third parties, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

177.   Defendants violated Cal. Penal Code § 631 by knowingly and without permission intercepting, wiretapping, accessing, taking and using Plaintiff's and the Class Members' personally identifiable information and personal communications with others.

178.   As a direct and proximate result of Defendants' violation of the Wiretapping Act, Plaintiff and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

179.   Defendants were unjustly enriched by its violation of the Wiretapping Act.

180.   Pursuant to California Penal Code Section 637.2, Plaintiff and Class Members have been injured by Defendants' violation of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

### NINTH CAUSE OF ACTION
### CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY
### (ON BEHALF OF PLAINTIFF BARE AND THE CALIFORNIA SUBCLASS)

181.   Plaintiff Bare ("Plaintiff" for this Count) incorporates the above allegations by reference as if fully set forth herein.

182.   Article I, section I of the California Constitution states:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*.

Cal. Const. art I § 1 (emphasis added).

183.    Plaintiff and California Subclass members have an interest in precluding the dissemination and misuse of their PII and other personal data by Defendants, and using their smartphones and apps without observation, intrusion, or interference by Defendants.

184.    Plaintiff and California Subclass Members had no knowledge and did not consent or authorize Defendants to obtain their PII and other personal data through SDKs or to share it with third parties, let alone the specific third parties Defendants shared it with and/or sold it to.

185.    Plaintiff and California Subclass Members enjoyed objectively reasonable expectations of privacy surrounding their PII and other personal data. Defendants' intrusion upon seclusion occurred the moment Defendants began tracking Plaintiffs and Class Members' PII and other personal data, including device and location data.

186.    Defendants' conduct was intentional and intruded on Plaintiff's and California Subclass Members' use of their personal property.

187.    Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data for reports for auto insurance companies to influence Plaintiff's and California Subclass Members' insurance rates without their prior knowledge or consent.

188.    As a direct and proximate result of Defendants' invasions of privacy, Plaintiff and California Subclass Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to overpayment for auto insurance services and decreased value of their PII and other personal data.

189.    Plaintiff and California Subclass Members week all relief available for invasion of privacy claims under the California Constitution, including nominal damages and general privacy damages.

**TENTH CAUSE OF ACTION**
**PENNSYLVANIA WIRETEAPPING AND ELECTRONIC SURVEILLANCE ACT**
**18 Pa. Stat. § 5703,** *et seq.*
**(ON BEHALF OF PLAINTIFF HARTZELL AND THE PENNSYLVANIA SUBCLASS)**

190.    Plaintiff Hartzell ("Plaintiff" for this Count), incorporates the above allegations by reference as if fully set forth herein.

191.    At all relevant times, there was in full force and effect Pennsylvania Wiretapping and Electronic Surveillance Act ("WECMA"), which prohibits parties that

> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

> (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

18 Pa. Stat. § 5703.

192.    Plaintiff's and Subclass Members' specific user input events and choices on their mobile devices that are tracked by Defendants' SDK constitute communications within the scope of the Pennsylvania's prohibition upon Wiretapping.

193.    Plaintiff and Subclass Members are residents of Pennsylvania, and used their smartphones within Pennsylvania. As such, Defendants intercept, collected, read or attempt to

read, and/or used or attempted to use Plaintiff's and Subclass Members' data, communications, and personal information in Pennsylvania.

194.    Defendants intercept Plaintiff's and Subclass Members' communications and data while they are in transit to and from Plaintiff's and Subclass Members' smartphones and the apps, app developers, and cellphone towers; Defendants transmit a copy of Plaintiff's and Subclass Members' communications to itself and/or third parties. Defendants use the contents of the communications to sell to third parties and in other methods for their own pecuniary gain.

195.    Neither Defendants nor any other person informed Plaintiff and Subclass Members that Defendants were intercepting and transmitting Plaintiff's private communications and data. Plaintiff and Subclass Members did not know Defendants were intercepting and recording their communications and data, as such they could not and did not consent for their communications and data to be intercepted by Defendants and thereafter transmitted to others.

196.    Defendants' SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Plaintiff's and Subclass Members' communications while they are using their smartphones.

197.    Defendants use and attempt to use or communicate the meaning of Plaintiff's and Subclass Members' communications and data by ascertaining their personal information, including their geolocation and places that they have visited and other PII and personal data, in order to sell Plaintiff's and Subclass Members' personal information to third parties and to use for Defendants' own gain.

198.    At all relevant times to this complaint, Defendants intercepted and recorded components of Plaintiff's and the putative Subclass members' private phone communications and

transmissions when Plaintiff and other Subclass Members accessed Defendants' software via their cellular mobile access devices within the State of Pennsylvania.

199.    At all relevant times to this complaint, Plaintiff and the other Subclass Members did not know Defendants were engaging in such interception and recording and therefore could not provide consent to have any part of their PII and other personal data and communications intercepted and recorded by Defendants and thereafter transmitted to others.

200.    Defendants never advised Plaintiff or the other Subclass Members that any part of their PII and other personal data and communications would be intercepted, recorded and transmitted to third parties.

201.    Defendants' use of MAIDs, IDFAs, IDFVs and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

202.    At all relevant times, by using Defendants' MAID software and SDK as well as tracking Plaintiff's and Subclass Class Members' geolocation, Defendants intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and Subclass Members on the one hand, and the specific sites, apps, and locations Plaintiff and Subclass Members visited on the other.

203.    At all relevant times, by using Defendants' geolocation tracking software technology, Defendants willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative Subclass Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within Pennsylvania.

204.    Plaintiff and Subclass Members did not consent to any of Defendants' actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or Subclass Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff and Subclass Members' electronic communications.

205.    Plaintiff's and the Subclass Members devices of which Defendants accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

206.    Defendants violated WECMA by knowingly accessing and without permission accessing Plaintiff's and Subclass Members' devices in order to obtain their personal information, including their communications and device and location data, and in order for Defendants to share that data with third parties, in violation of Plaintiff's and Subclass Members' reasonable expectations of privacy in their devices and data.

207.    Defendants violated WECMA by knowingly and without permission intercepting, wiretapping, accessing, taking and using Plaintiff's and the Subclass Members' personally identifiable information and personal communications with others.

208.    As a direct and proximate result of Defendants' violation of WECMA, Plaintiff and Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

209.    Defendants were unjustly enriched by its violation of WECMA.

210.    Pursuant to 18 Pa. Stat. § 5703, Plaintiff and Class Members have been injured by Defendants' violation, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

**ELEVENTH CAUSE OF ACTION**
**UNLAWFUL USE OF COMPUTER**
**73 Pa. Stat. § 7611, *et seq*.**
**(ON BEHALF OF PLAINTIFF HARTZELL AND THE PENNSYLVANIA SUBCLASS)**

211.    Plaintiff Hartzell ("Plaintiff" for this Count), incorporates the above allegations by reference as if fully set forth herein.

212.    Pennsylvania criminal code prohibits parties to "intentionally and without authorization accesses or exceeds authorization to access, alters, interferes with the operation of, damages or destroys any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof," and to "intentionally or knowingly and without authorization gives or publishes a password, identifying code, personal identification number or other confidential information about a computer, computer system, computer network, computer database, World Wide Web site or telecommunication device." 73 Pa. Stat. § 7611(a).

213.    Plaintiff's and Pennsylvania Subclass Members' smartphones constitute "computers" within the scope of Pennsylvania law.

214.    Defendants knowingly accessed Plaintiff's and Pennsylvania Subclass Members' smartphones without their permission by including within the SDK (that Defendants provide to developers) software that intercepts and transmits data, communications, and personal and confidential information concerning Plaintiff and Pennsylvania Subclass Members.

215.    Defendants used data, communications, and personal information that it intercepted and took from Plaintiff's and Pennsylvania Subclass Members' smart phones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Subclass Members.

216.    Defendants knowingly and without Plaintiff's and Subclass Members' permission accessed or caused to be their smartphones by installing without Plaintiff's and Subclass Members'

informed consent software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Subclass Members.

217. Plaintiff and Pennsylvania Subclass Members are residents of Pennsylvania, and used their smartphones in Pennsylvania. Defendants accessed or caused to be accessed Plaintiff's and Pennsylvania Class Members' data, communications, and personal information from Pennsylvania.

218. As a direct and proximate result of Defendants' violations of the Pennsylvania unlawful computer use statute, Plaintiff and Pennsylvania Subclass Members suffered damages.

219. Plaintiff and Subclass Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial, including an award of reasonable attorneys' fees and costs and punitive or exemplary damages for Defendants' willful violations.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW,**
**73 Pa. Stat. § 201, *et seq.***
**(ON BEHALF OF PLAINTIFF HARTZELL AND THE PENNSYLVANIA SUBCLASS)**

220. Plaintiff Hartzell ("Plaintiff" for this Count), incorporates the above allegations by reference as if fully set forth herein.

221. Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTP") defines "unfair or deceptive acts or practices" to include any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201, *et seq.*

222. Pennsylvania courts have invariably interpreted the UTP using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

223. Plaintiff and the Pennsylvania Subclass Members, as "person[s]," are consumers within the protection of the UTP. *See* 73 Penn. Stat. § 201-2(2).

224. Defendants' engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 73 Penn. Stat. § 201-2(4), including but not limited to the following: (a) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiff's and Pennsylvania Subclass Members' Personal; (b) using that PII and other personal data to impose increased insurance rates; and (c) selling and/or transmitting Plaintiff's and Pennsylvania Subclass Members' data to third parties without their consent.

225. The unfair, unconscionable, and unlawful acts and practices of Defendants alleged herein, emanated and arose within the Commonwealth of Pennsylvania, within the scope of the UTP.

226. Plaintiff and Pennsylvania Subclass Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendants immediately purge, delete, and destroy PII and other personal data not necessary for its provisions of services; and (b) remove tracking technology that causes the disclosure of PII and other personal data without consent.

227. Plaintiff brings this action on behalf of herself and Pennsylvania Subclass Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed decisions with their PII and other personal data and to protect Plaintiff, Pennsylvania Subclass Members, and the public from Defendants' unconscionable, and unlawful practices. Defendants' wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

228. Defendants' actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

229.     Plaintiff and Pennsylvania Subclass Members seek relief under the UTP, 73 P.S. §§ 201-1, *et seq.*, including, but not limited to, a declaratory judgment that Defendants' actions and/or practices violate the UTP; and injunctive relief enjoining Defendants, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate the UTP as described above.

230.     Plaintiff and Pennsylvania Class Members therefore seeks restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

### THIRTEENTH CAUSE OF ACTION
### PENNSYLVANIA INVASION OF PRIVACY
### (ON BEHALF OF PLAINTIFF HARZELL AND THE PENNSYLVANIA SUBCLASS)

231.     Plaintiff Hartzell ("Plaintiff" for this Count), incorporates the above allegations by reference as if fully set forth herein.

232.     Pennsylvania recognizes an inherent right to privacy.

233.     Plaintiff and Pennsylvania Subclass Members have an interest in precluding the dissemination and misuse of their geolocation, and other PII and other personal data by Defendants, and precluding the use of their personal property without observation, intrusion, or interference by Defendants.

234.     Plaintiff and Pennsylvania Subclass Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

235.     Plaintiff and Pennsylvania Subclass Members had no knowledge and did not consent or authorize Defendants to obtain their driving telematics data or to share it with third parties, let alone the specific third parties to whom Defendants shared it with and/or sold Plaintiff's and Class Members' data.

236.     Plaintiff and Pennsylvania Subclass Members enjoyed objectively reasonable expectations of privacy surrounding their data, including their precise location and other PII and personal data. Defendants' intrusion upon seclusion occurred the moment Defendants began tracking Plaintiff and Pennsylvania Subclass Members' personal data, including their locations and other PII and other data.

237.     Defendants' conduct was intentional and intruded on Plaintiff's and Pennsylvania Subclass Members' use of their personal property.

238.     Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data for reports for auto insurance companies to influence Plaintiff's and Pennsylvania Subclass Members' insurance rates without their prior knowledge or consent.

239.     As a direct and proximate result of Defendants' invasions of privacy, Plaintiff and Pennsylvania Subclass Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to overpayment for auto insurance services and decreased value of their driving telematics data.

240.     Plaintiff and Pennsylvania Subclass Members week all relief available for invasion of privacy claims, including nominal damages and general privacy damages.

241.     Plaintiff, on behalf of herself and Pennsylvania Subclass Members, further seeks injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of Plaintiff's and Pennsylvania Subclass Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

### **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of all other Class Members, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A. Certifying the Classes as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Classes appropriate monetary relief, including actual damages, statutory damages, and punitive damages;

C. Awarding Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

D. Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and

E. Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: January 17, 2025                    Respectfully submitted,

/s/ Daniel O. Herrera
Daniel O. Herrera
Bryan L. Clobes*
Nickolas J. Hagman
Nabihah Maqbool*
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
bclobes@caffertyclobes.com
nmaqbool@caffertyclobes.com